Gants, J.
The plaintiffs are legal immigrants who have been denied cash assistance benefits from the Commonwealth of Massachusetts because they have resided in the Commonwealth for less than six months. They have filed suit in this Court claiming that Massachusetts’ six-month residency requirement violates the United States and Massachusetts Constitutions. The plaintiffs now move for partial summary judgment, seeking an order from this Court that the six month residency requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Part 1, Articles 1 and 10 of the Massachusetts Declaration of Rights. The defendant, Claire Mclntire, the Commissioner of the Department of Transitional Assistance for the Commonwealth of Massachusetts (“the Commissioner”), has herself moved for summary judgment, contending that the six-month residency requirement passes constitutional muster. After hearing, for the reasons detailed below, the plaintiffs’ motion for partial summary judgment is DENIED and the defendant Commissioner’s motion for partial summary judgment is ALLOWED.
BACKGROUND
In August 1996, the United States Congress enacted and the president signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (“the 1996 Act”), Pub. L. No. 104-193 (August 22, 1996), 8 U.S.C. §1611 et seq. The 1996 Act severely restricted the eligibility of legal immigrants for federally funded benefits otherwise provided to needy families, including benefits under the federal Supplemental Security Income (SSI) program for the aged, blind, and disabled, the federal food stamp program, the Medicaid program, and the program of block grants to states for temporary assistance for needy families under 42 U.S.C. §1397 et seq. See 8 U.S.C. §§1612 and 1613.
Under the 1996 Act, aliens were effectively divided into two categories — those who were “qualified aliens” and those who were not. A “qualified alien” is an alien who, at the time she applied for or received federal benefits, was either lawfully admitted for permanent residence under the Immigration and Nationality Act, 8 U.S.C. §1101 et seq., or had been granted asylum, or was a refugee, or fell into other limited categories set forth in8U.S.C.§1641. Those who are not qualified aliens are not eligible for any federal public benefit, except limited short-term benefits such as emergency medical assistance, immunizations, and access to soup kitchens. 8 U.S.C. §§1611. Those who are qualified aliens are eligible for federal public benefits, but only if they have legally been in this country for at least five years. See 8 U.S.C. §§1612 and 1613. The residency requirement most pertinent to this case provides that a qualified alien “who enters the United States on or after August 22, 1996 is not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien’s entry into the United States with a status under the meaning of the term ‘qualified alien.’ ” 8 U.S.C. §§1613(a). Among the Federal means-tested public benefits covered by this five-year residency requirement is the program of Federal block grants to states for temporary assistance for needy families under Part A of Title IV of the Social Security Act, 42 U.S.C. §601 et seq., known as Temporary Assistance for Needy Families (“TANF”). 8 U.S.C. §1612 (b)(3)(A). As a result of the 1996 Act, Massachusetts (and every other state in the union) was barred from using Federal monies obtained through TANF block grants to provide temporary assistance to needy qualified aliens who entered the United States after August 22, 1996, and who failed to meet the five-year residency requirement.
The 1996 Act also prohibited states from using state or local monies to provide welfare, health, and other benefits (except limited short-term benefits such as emergency medical assistance, immunizations, and access to soup kitchens), to those who are not qualified aliens. 8 U.S.C. §1612. The Act did not, however, prohibit states from using state or local monies to provide welfare, health, and other benefits to qualified aliens, even those qualified aliens who failed to satisfy the federal residency requirement and were therefore barred from federally-funded benefits. 8 U.S.C. §1622(a). Rather, the 1996 Act simply “authorized" states “to prohibit or otherwise limit or restrict the eligibility” of qualified aliens for state cash assistance programs as each state saw fit, provided the state did not impose “prohibitions, limitations, or restrictions . . . more restrictive than . . . under comparable Federal programs.” 8 U.S.C. §1624 (a) and (b). In short, under the 1996 Act, Massachusetts was barred from paying a penny of state money in cash assistance to aliens who were not qualified aliens. Massachusetts was free to use state money to pay cash assistance to qualified aliens, with or without prohibitions, restrictions, or limitations, as long as any prohibitions, restrictions, or limitations it did impose were not more severe than those imposed under federal law for federal cash assistance.
When the 1996 Act was enacted, Massachusetts had only one cash assistance program for needy families — the Transitional Aid to Families with Dependent Children program (“the TAFDC program”) — which was funded with Federal block grants and state monies. The TAFDC program, before the 1996 Act, had provided benefits to qualified aliens as well as citizens without any durational residency requirement, but as a result of the 1996 Act, it could not pay a penny to qualified aliens who had been in the United States for less than five years.
*699 In response to the 1996 Act, Massachusetts in 1997 enacted a second cash assistance program — the Supplemental Transitional Aid to Needy Families (“the Supplemental program”) — for the purpose of providing cash assistance benefits to needy qualified aliens and their families who had been in the United States less than five years and therefore were barred from receiving benefits under the TAFDC program. St. 1997, c. 43, §210. Indeed, only qualified aliens who are ineligible to receive federal benefits under the 1996 Act are eligible to receive state benefits under the Supplemental program. Id. The Supplemental program is funded entirely with state monies; it is not supported by any Federal funds. While the Supplemental program was enacted to provide cash assistance to needy immigrant families who are ineligible for TAFDC benefits because they cannot meet the five-year durational residency requirement under the 1996 Act, the Supplemental program has its own more modest durational residency requirement — to be eligible for Supplemental benefits, immigrants must have “resided in the commonwealth for at least six months prior to [their] application for such benefits.” St. 1997, c. 43, §210(c)(3). It is the constitutionality of this six-month durational residency requirement that the plaintiffs challenge in this litigation.
DISCUSSION
The Supreme Court’s Decision in Graham v. Richardson
The plaintiffs rest their constitutional challenge largely on the Supreme Court decision in Graham v. Richardson, which held “that a state statute that denies welfare benefits to resident aliens and one that denies them to aliens who have not resided in the United States for a specified number of years violates the Equal Protection Clause.” 403 U.S. 365, 376 (1971).
In Graham, the Supreme Court considered the constitutionality of two state statutes, one from Arizona and the other from Pennsylvania. The Arizona statute prohibited anyone who was not a United States citizen or who had not resided in the United States for a total of fifteen years from being eligible for disability benefits administered by the state under federal guidelines. Id. at 367. Under the Arizona statute, an alien became eligible for disability benefits only after she resided in this country for fifteen years. Id. at 367 and 371. The Pennsylvania statute created two categories of persons who were eligible for welfare assistance: “(1) needy persons who qualify under the federally supported categorical assistance programs and (2) those other needy persons who are citizens of the United States.” Id. at 369. Under the Pennsylvania statute, needy persons who did not qualify for federal assistance programs may be eligible for state assistance, but only if they were citizens and not aliens. Id. Under both the Arizona and Pennsylvania statutes, needy persons who would be eligible for state welfare assistance if they were citizens were denied assistance solely because of their alienage. Id. at 371.
The Supreme Court in Graham, on two separate and independent grounds, found that these statutes did not withstand constitutional scrutiny. First, as noted earlier, it held that these statutes violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Id. at 376. The Court recognized that aliens, under the Fourteenth Amendment, were entitled to the equal protection of the laws in the state in which they reside. Id. at 371. The Court found that “classifications based on alien-age, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a ‘discrete and insular’ minority ... for whom such heightened judicial solicitude is appropriate.” Id. at 372, quoting United States v. Carolene Products Co., 304 U.S. 144, 152-53 n. 4 (1938). It further found that the Arizona and Pennsylvania state laws classified needy persons based on alienage, in that needy aliens were denied benefits that would have been available to them if they had been citizens. Graham at 371. The Court applied strict scrutiny to the application of these classifications in the two state statutes, and that scrutiny proved fatal. The Court concluded “that a State’s desire to preserve limited welfare benefits for its own citizens is inadequate to justify Pennsylvania’s making noncitizens ineligible for public assistance, and Arizona’s restricting benefits to citizens and longtime resident aliens.” Id. at 374. The Court specifically found that a state’s interest in cutting welfare costs is not sufficient to justify invidious distinctions between citizens and aliens. Id. at 375, quoting Shapiro v. Thompson, 394 U.S. 618, 633 (1969) (“The saving of welfare costs cannot justify an otherwise invidious classification”).
The Supreme Court in Graham also held that these two state statutes violated the Supremacy Clause of the United States Constitution because they encroached upon the exclusive power of the federal government to determine what aliens shall be admitted to the United States, the period they may remain, and the regulation of their conduct before naturalization. Id. at 376-77, citing Takahashi v. Fish & Game Comm’n, 334 U.S. 410, 419 (1948). The Court found that, by denying public assistance to aliens who cannot work and become indigent, the state is effectively asserting a right, inconsistent with federal immigration policy, to deny these indigent aliens “entrance and abode,” since aliens cannot live where they cannot secure the necessities of life. Id. at 379-80, quoting Truax v. Raich, 239 U.S. 33, 42 (1915). “And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be seg *700 regated In each of the states as chose to offer hospitality.” Id. at 379, quoting Truax v. Raich, 239 U.S. at 42.
The plaintiffs contend that the six-month residency requirement for eligibility for benefits under the Supplemental program applies only to aliens and not to citizens, and therefore, under Graham, must be subject to strict scrutiny under the Equal Protection Clause. The Commissioner argues that this residency requirement was authorized by the 1996 Act and, therefore, under the Supreme Court’s decision in Matthews v. Diaz, 426 U.S. 67 (1976), must be examined under the rational basis test.
The Supreme Court’s Decision ' in Matthews v. Diaz
The question considered by the Supreme Court in Matthews is whether Congress may deny Medicare benefits to permanent resident aliens who have resided in the United States for less than five years. Id. at 69-71. The Court ruled unanimously that it may. The Court observed:
In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government’s power to regulate the conduct of its own citizenry. The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is “invidious.”
Id. at 79-80. Applying the rational basis test to this federal statute, the Court found that Congress reasonably may have presumed that permanent resident aliens who have resided in the United States for more than five years “have a greater affinity with the United States than those who do not” and that the five-year line it drew, while inherently arbitrary, is not unreasonable. Id. at 83-84.
The Court recognized the seeming conflict between its decision in Matthews and its holding in Graham that a durational residency requirement for welfare benefits imposed upon aliens by a state violates the Equal Protection Clause. Id. at 84. The Court resolved this conflict by noting that it was “the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens.” Id. It then declared:
Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State’s interests in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business.
Id. at 85.
Synthesis
When one examines Graham and Matthews in the context of the constitutional jurisprudence that followed these decisions, it becomes clear that a state law that treats legal resident aliens differently from citizens with respect to the receipt of economic benefits must be evaluated on two different grounds.
Evaluation under the Supremacy Clause
First, it must be evaluated to determine whether it interferes with the Federal Government’s constitutionally derived authority to regulate the status of aliens. As the Supreme Court noted in Toll v. Moreno, “Federal authority to regulate the status of aliens derives from various sources, including the Federal Government’s power ‘[t]o establish [a] uniform Rule of Naturalization,’ U.S.Const., Art. I, §8, cl. 4, its power ‘[t]oregulate Commerce with foreign Nations’, id., cl. 3, and its broad authority over foreign affairs.” 458 U.S. 1,10 (1982). The Toll Court then declared:
The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.
Id. at 12, quoting Takahashi v. Fish & Game Comm’n, 334 U.S. at 419. The Court concluded:
Read together, Takahashi and Graham stand for the broad principle that “state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.”
Id. at 12-13, quoting De Canas v. Bica, 424 U.S. 351, 358, n. 6 (1976).
There is no doubt that the six-month residency requirement imposed in Massachusetts upon qualified aliens does not conflict with the exclusive federal power to regulate immigration. The 1996 Act expressly “authorized" states “to prohibit or otherwise limit or restrict the eligibility” of qualified aliens for state cash assistance programs as each state saw fit, provided *701 the state did not impose “prohibitions, limitations, or restrictions . . . more restrictive than . . . under comparable Federal programs.” 8 U.S.C. §1624 (a) and (b). The six-month residency requirement imposed in Massachusetts is precisely the type of restriction upon eligibility that Congress authorized, so it cannot be said to impose an additional burden not contemplated by Congress.
Nor can it be fairly said that this durational residency requirement is more restrictive than under the comparable Federal program — TANF. It is true that the durational state residency requirement that Massachusetts imposed differs from any imposed on TANF recipients under the 1996 Act, since it requires a qualified alien to have resided in Massachusetts for the past six months and not simply in the United States. Yet, it must be remembered that the six-month residency requirement applies only to eligibility for the Supplemental program, and only qualified aliens who are not eligible to receive federal funds under the TANF program are eligible for state funds under the Supplemental program. Consequently, only those who would not receive benefits from the comparable TANF program will receive benefits, after six-months residency in Massachusetts, from the Supplemental program. Since the six-month residency requirement simply restricts the eligibility of those who would not receive any benefits under the comparable TANF program, it cannot be deemed to be a “prohibition, limitation, or restriction . . . more restrictive than . . . under comparable Federal programs.” 8 U.S.C. §1624 (a) and (b).
Evaluation under the Equal Protection Clause
A state law that treats legal resident aliens differently from citizens with respect to the receipt of economic benefits must also be scrutinized to determine whether it violates the Equal Protection Clause.[2] Since the states have no power to regulate immigration or naturalization, a state may not justify distinctions between citizens and aliens as necessary to such regulation. As far as Massachusetts is concerned, with respect to the provision of welfare benefits, a United States citizen who moves to Massachusetts from Connecticut is as much an “alien” as a permanent resident alien who moves here from France. Therefore, any state law that treats the “alien” from France more harshly than the “alien” from Connecticut is inherently suspect and must withstand strict judicial scrutiny. See, e.g., Graham, 403 U.S. at 376; Matthews, 436 U.S. at 85; Nyquist v. Mauclet, 432 U.S. 1, 7-12 (1977).
When a state is required by federal law to treat aliens differently from citizens, then the relaxed scrutiny of the rational basis test is appropriate to examine that mandated state law because, for all practical purposes, that mandated state law is part of the federal regulation of immigration and naturalization. See Matthews at 82-84; Nyquist v. Mauclet, 432 U.S. at 7, n. 8. Therefore, a state law carrying out the federal mandate in the 1996 Act that a state deny all but emergency welfare benefits to those aliens who are not qualified aliens must be examined under the rational basis test, not strict scrutiny.
The 1996 Act, however, does not mandate that the states deny benefits paid entirely with state monies to qualified aliens who fail to satisfy the federal durational residency requirements. It simply “authorized” states “to prohibit or otherwise limit or restrict the eligibility” of qualified aliens for state cash assistance programs as each state saw fit, provided the state did not impose “prohibitions, limitations, or restrictions . . . more restrictive than . . . under comparable Federal programs.” 8 U.S.C. §1624 (a) and (b). This authorization cannot be deemed part of the federal regulation of immigration or naturalization because it permitted the states to do whatever they thought best with their own money, as long as they did not act more harshly towards qualified aliens than Congress had by enacting the 1996 Act. Presumably, Congress did not believe that the federal regulation of immigration and naturalization would be materially affected by whatever the states chose to do with state monies within this broad grant of authority. Certainly, Congress had the power to direct the states to deny all state benefits to qualified aliens, as it did with those who were not qualified aliens. The fact that Congress left these matters to the states with respect to qualified aliens was as purposeful as its decision to handcuff the states with respect to non-qualified aliens.
While courts will give deference to federal laws that regulate immigration or naturalization even when they discriminate against aliens, and to state laws mandated by such federal laws, no deference is due to state laws that discriminate against aliens but do not implement federal policy regarding immigration or naturalization. Nor may Congress, by statute, authorize a state to violate the Equal Protection Clause. Saenz v. Roe, 526 U.S. 489, 507 (1999) (“we have consistently held that Congress may not authorize the States to violate the Fourteenth Amendment”); Shapiro v. Thompson, 394 U.S. 618, 641 (1971). Since this Congressional authorization in 8 U.S.C. §1624 (a) and (b) cannot be said to have advanced any federal policy towards immigration or naturalization, and since Congress may not authorize a state to violate the Equal Protection Clause, the authorization has no consequence with respect to the equal protection examination of state laws that were enacted within this authorization. Rather, this Congressional authorization matters in evaluating the constitutionality of these state laws only in determining whether these laws, having been authorized by Congress, violate the Supremacy Clause. See Barannikova v. Town of Greenwich, 229 Conn. 664, 643 A.2d 251 (S.Ct. Conn. 1994).
Therefore, this Court rejects the Commissioner’s argument that Congressional authorization, rather *702 than Congressional mandate, is sufficient to shift a state law from the realm of strict scrutiny into the realm of rational basis. In short, rational basis analysis in this case cannot be justified on the grounds of federal regulation of immigration and naturalization, because Congress did not care whether or not Massachusetts provided these welfare benefits to qualified aliens, with or without limitations. Congress simply insisted that, whatever a state chose to do with state monies with respect to qualified aliens, it may not act more harshly towards these aliens than Congress.[3]
This finding, however, does not necessarily lead to the conclusion that the six-month residency requirement for eligibility in the Supplemental program must be subject to strict scrutiny. In every case that this Court has seen where strict scrutiny was applied with respect to alienage, the state had discriminated against aliens by denying them benefits or privileges that would have been available to them had they been citizens. See, e.g., Graham 403 U.S. at 367-71 (limiting eligibility for state welfare benefits to citizens and resident aliens who have been in this country for fifteen years); Sugarman v. McDougall, 413 U.S. 634 (1973) (limiting civil service eligibility to citizens); Nyquist v. Mauclet, 432 U.S. 1 (1977) (limiting financial assistance for higher education to citizens and resident aliens who declared their intent to become citizens). The principle that has been declared by the Supreme Court has been “where the State chooses to discriminate against permanent resident aliens, ‘the governmental interest claimed to justify the discrimination is to be carefully examined in order to determine whether that interest is legitimate and substantial, and inquiry must be made whether the means adopted to achieve the goal are necessary and precisely drawn.’ ” Cabell v. Chavez-Salido, 454 U.S. 432, 450 (1982) (dissent), quoting Examining Board v. Flores de Otero, 426 U.S. 572, 605 (1976). “Alienage classifications by a State that do not withstand this stringent examination cannot stand." Nyquist v. Mauclet, 432 U.S. at 7.
That is not the situation, however, in the case at bar. Qualified aliens who fail to meet the stiff durational residency requirements under the 1996 Act are barred from the Massachusetts TAFDC program because this program is funded in part by federal TANF block grants and no program that receives TANF money may pay benefits to qualified aliens who are ineligible for federal benefits under the 1996 Act. The Supplemental program was created solely to ameliorate the financial distress of needy qualified aliens who, as a result of the 1996 Act, could not receive any benefits from the TAFDC program. According to the legislation that created the Supplemental program, no citizen and no qualified alien eligible to receive TAFDC monies is eligible to receive benefits from the Supplemental program. St. 1997, c. 43, §210. The six-month residency requirement applies only to eligibility in the Supplemental program and, therefore, applies only to those qualified aliens who are barred from the TAFDC program.
It is true that needy citizens who fail to meet the six-month residency requirement may receive transitional benefits, but they may receive such benefits only from the TAFDC program, not from the Supplemental program. Needy qualified aliens who are eligible to receive federal benefits under the 1996 Act and therefore are eligible for TAFDC benefits, like needy citizens, may also receive transitional benefits from the TAFDC program even if they have not resided in Massachusetts for six months. They, too, may not receive any benefits from the Supplemental program. Therefore, for all practical purposes, Massachusetts treats citizens and qualified aliens who are eligible for federal transitional assistance the same with respect to eligibility for transitional benefits.
The six-month residency requirement cannot be said to discriminate between citizens and qualified aliens. While aliens who fail to meet that eligibility requirement are denied benefits under the Supplemental program, citizens who fail to meet it are also denied benefits under this program. Indeed, citizens are barred entirely from all benefits from this program. Therefore, in contrast with the welfare programs in Graham, this is not a case where citizens are eligible for benefits under a particular welfare program and similarly situated qualified aliens are not.
There is no question that the federal government, through the 1996 Act, discriminates against qualified aliens regarding the receipt of welfare benefits, but that discrimination has been upheld by the courts as reasonably related to the exclusive federal authority to regulate immigration and naturalization. See City of Chicago v. Shalala, 189 F.3d 598 (7th Cir. 1999), cert. den., 120 S.Ct. 1530 (2000); Rodriquez v. United States, 169 F.3d 1342 (11th Cir. 1999); Kiev v. Glickman, 991 F.Supp. 1090 (D. Minn. 1998); Abreu v. Callahan, 971 F.Supp. 799 (S.D.N.Y. 1997). The 1997 Massachusetts legislation that created the Supplemental program actually discriminated in favor of qualified aliens because it made those who were ineligible to receive federal TANF funds (and therefore ineligible to receive commingled federal-state TAFDC funds) eligible to receive benefits under the Supplemental program and barred citizens from access to these Supplemental funds. Indeed, the plaintiffs concede that Massachusetts was not legally or constitutionally required to enact a Supplemental program, that it could have chosen to leave in place only the TAFDC program, and that, if it did, qualified aliens who were ineligible under the 1996 Act for federal welfare benefits would have been denied access to all welfare benefits. Therefore, the discrimination at issue in this case — the six-month residency requirement— actually discriminates against a sub-class of the class of qualified aliens — those who have not resided in Massachusetts for at least six months.
*703 While strict scrutiny certainly must be applied to examine whether state law violates the Equal Protection Clause when it grants welfare benefits to citizens and denies such benefits to similarly situated qualified aliens, it is not at all clear that strict scrutiny is required in this unique situation. This Court, having struggled with this issue, concludes that strict scrutiny is not required here, and that the rational basis test is the more appropriate test to employ to examine the 1997 Massachusetts legislation.
The rationale for subjecting legislative classifications based on alienage to strict judicial scrutiny is that aliens are a discrete and insular minority with virtually no political power who are susceptible to being abused by our political process and therefore entitled to “heightened judicial solicitude.” See Graham, 403 U.S. at 372. Consequently, whenever a state legislature passes a welfare law that treats an alien worse than a citizen, that law merits strict scrutiny to ensure that the governmental interests being advanced are legitimate and substantial, and that the discriminatory means are necessary and narrowly tailored to accomplish these legitimate purposes. See Examining Board v. Flores de Otero, 426 U.S. at 605. When a state legislature, like the Massachusetts General Court, acts as it did here to help needy immigrants by creating and funding a Supplemental program intended solely to provide welfare benefits to immigrants who were cut off from TAFDC funds by Congress in the 1996 Act, “heightened judicial solicitude” is not needed. If the Massachusetts Legislature wished to mistreat qualified aliens, it easily (and lawfully) could have done nothing and allowed the harsh consequences of the 1996 Act to take their toll on these aliens. The 1997 Massachusetts legislation did not advance the interests of citizens over those of aliens. Citizens do not receive a penny of the Supplemental funds appropriated; every penny goes to needy qualified aliens.
When a state law benignly benefits only aliens and does not in anyway put citizens in a superior position to similarly situated aliens, then this Court believes that it should be examined through the rational basis test rather than strict scrutiny. This is especially true where the Legislature lawfully could have done nothing to assist aliens, but instead chose to act (and to spend state monies) on their behalf. The purpose of strict scrutiny is judicially to protect the interests of discrete and insular minorities. It does not further this interest for the judiciary to apply strict scrutiny to benign legislation intended to assist such minorities and apply no scrutiny to a failure of the Legislature to act on their behalf, because such judicial intervention simply encourages legislative inaction. The Legislature may become unwilling to open its purse on behalf of minorities if it believes that, by doing so, the judiciary will require it to pay more than it intended. It may indeed often be true in life that no good deed goes unpunished, but it need not be a principle of judicial review regarding legislative good deeds.
Rational basis review is appropriately deferential to legislative choices, since the conditions that justify a court in questioning those choices are not present. As the Seventh Circuit has declared:
The Supreme Court has admonished that “rational-basis review in equal protection analysis ‘is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.’ ” Heller v. Doe, 509 U.S. 312, 319 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)). Rather, a statute survives rational basis scrutiny “if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.” Id. at 320. Moreover, under rational basis review, [the legislature] need not actually articulate the legitimate purpose or rationale that supports the classification at issue. Instead, a statute “must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.” Id. (quoting Beach Communications, 508 U.S. at 313) (internal quotation marks omitted).
City of Chicago v. Shalala, 189 F.3d at 605-06.
Applying that deferential review, this Court finds that the six-month residency requirement satisfies the rational basis test. In Matthews, the Supreme Court acknowledged that some durational residency requirements must be appropriate “unless mere transients are to be held constitutionally entitled to benefits.” 426 U.S. at 82. The Court found that “it is unquestionably reasonable for Congress to make an alien’s eligibility depend on both the character and the duration of his residence.” Id. at 82-83. The Court reasoned that “some line is essential.. . [and] any line must produce some harsh and apparently arbitrary consequences.” Id. at 83. “When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment.” Id. at 84. In Matthews, the Supreme Court upheld a five-year residency requirement for eligibility for Medicare benefits. While this Court recognizes that the legitimate interests of Congress differ from those of a state legislature, this Court is “especially reluctant to question the exercise of [legislative] judgment” when it imposed a more modest six-month residency requirement.[4]
ORDER
For the reasons stated above, the plaintiffs’ motion for partial summary judgment is DENIED and the defendant Commissioner’s motion for partial summary judgment is ALLOWED.

At the hearing In this case, the Attorney General, as attorney for the Commissioner, made the extraordinary argument that Graham should be interpreted solely as a Supremacy Act case and should not be understood as requiring that state welfare laws distinguishing between citizens and aliens withstand strict scrutiny under the Equal Protection Clause. It suffices to say that this argument is wrong. Two years after Graham was decided, the Supreme Court declared:
It is established, of course, that an alien is entitled to the shelter of the Equal Protection Clause ... In Graham v. Richardson, 403 U.S., at 372, ... we observed that aliens as a class “are a prime example of a ‘discrete and insular’ minority . . .’’ and that classifications based on alienage are “subject to close judicial scrutiny.”
Sugarman v. McDougall, 413 U.S. 634, 641-42 (1973), quoting United States v. Carolene Products Co., 304 U.S. at 152-53, n. 4. Indeed, no less an authority than Chief Justice Rehnquist later observed, “Graham v. Richardson is, of course, the starting point of analysis, as it was the first case to explicitly conclude that alienage classifications, like those based on race or nationality, would be subject to strict scrutiny when challenged under the Equal Protection Clause of the FourteenthAmendment."Nyquist v. Mauclet, 432 U.S. 1, 17 (1977) (Rehnquist, J., dissent).

To the extent that this reasoning is inconsistent with that of the New York State appellate court which has grappled with this question and concluded that the federal authorization provision requires review under the rational basis test, this Court respectfully disagrees with that court. See Alvarino v. Wing, 261 A.D.2d 255, 690 N.Y.S.2d 262 (S.Ct.App.Div., 1st Dept. 1999) (since state food assistance legislation was within federal authorization under the 1996 Act, “the challenged provisions are therefore entitled to the same rational basis review as would a Federally-enacted law classifying aliens”); Aliessa v. Novello, 712 N.Y.S.2d 96 (S.Ct.App.Div. 1st Dept. 2000) (same). The South Dakota Supreme Court, unlike the New York Appellate Division, did not consider the constitutionality of state legislation providing state funds to qualified aliens who were denied benefits under the 1996 Act. Rather, the South Dakota Supreme Court simply upheld the constitutionality of the state administrative regulations that implemented the restrictions mandated by the 1996 Act, which plainly are subject to rational basis review. Cid v. South Dakota Department of Social Services, 598 N.W.2d 887 (S.Ct.S.Dak. 1999).

This Court recognizes that the plaintiffs excluded from their motion for partial summary judgment the claim in their complaint alleging that the six-month residency requirement violated a qualified alien’s right to travel. This Court, therefore, will not decide the merits of that claim in this decision. The Court, however, has observed that, in Saenz v. Roe, the Supreme Court examined a California statute that limited state TANF benefits in the first year of a needy citizen’s California residency to those received by the recipient in the state of her prior residence. 526 U.S. 489 (1999). The Court ruled that the statute violated that citizen’s right to travel under Article IV, §2 of the United States Constitution, which provides, ‘The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States,” and under that part of the Fourteenth Amendment which provides, “No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Id. While the six-month residency requirement in the 1997 Massachusetts legislation restricts the travel of qualified aliens in a similar fashion, this Court knows of no case that has declared that the “right to travel" applies to non-citizens. See id.; Shapiro v. Thompson, 394 U.S. 618 (1969). If the plaintiffs seek to press this claim, they will need to demonstrate why this Court should extend the “right to travel” to non-citizens, especially when it is premised on the “Privileges and Immunities” clauses in our Constitution that specifically make reference to citizenship.